**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ARTHUR LOVI,

       Plaintiff,

      v.

VILLAGE OF ARLINGTON HEIGHTS, et al.,

      Defendants.

No. 13 CV 00788 and
No. 13 CV 06854
(Consolidated)

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Arthur Lovi claims members of the Arlington Heights Police Department violated the United States Constitution and Illinois law by entering his home, seizing his firearms and FOID card, and refusing to return his property. Plaintiff further claims that on a separate occasion, Arlington Heights policemen forced him into an ambulance against his will and in violation of his rights. Defendants have moved for summary judgment on all claims. Dkt. 50.[1] For the following reasons, defendants' motion is granted in part and denied in part.

## I. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the

---

[1] Citations to "Dkt." refer to the docket in *Lovi v. Village of Arlington Heights, et al.*, No. 13-cv-00788 (N.D. Ill.).

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted); *see also Celotex*, 477 U.S. at 322 ("plain language of Rule 56[a] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

## II.     Background

### A.     August 30, 2012 Incident

Plaintiff Arthur Lovi was a 73-year-old resident of Arlington Heights, Illinois. Dkt. 59 ¶ 1, Plaintiff's Response to Defendants' Local Rule 56.1 Statement; Dkt. 67 ¶ 1, Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Facts. On August 30, 2012, plaintiff met with his therapist, Dr. Whitney Tschan. Dkt. 59 ¶ 4. During the session, plaintiff told Dr. Tschan that he felt his wife's physician, Dr. Ham, committed malpractice when treating her nine years earlier. Dkt. 67 ¶ 5. According to plaintiff, he told Dr. Tschan that—at the time he learned Dr. Ham had

failed to perform a blood test on his wife—plaintiff "would have punched the doctor in the nose if he saw him." Dkt. 60 ¶ 6, Plaintiff's Local Rule 56.1 Statement of Facts. Dr. Tschan informed plaintiff that because he threatened Dr. Ham by name, she had a legal duty to warn both Dr. Ham and the police. Dkt. 67 ¶ 7; Dkt. 59 ¶ 5.

When Dr. Tschan called the Arlington Heights Police Department, she reported to Officer David Lavin that plaintiff had threatened to beat Dr. Ham within an inch of his life and to run him over with his car. Dkt. 59 ¶ 7; Dkt. 67 ¶ 9. Lavin called plaintiff to confirm the threat. Dkt. 69 ¶ 8. According to plaintiff, during this call he admitted to saying he would have punched Dr. Ham in the nose if he had seen him nine years ago when plaintiff learned of the malpractice. Dkt. 59 ¶ 8; Dkt. 60 ¶ 10. Lavin ran plaintiff's criminal history and learned that he had no criminal convictions and a valid Firearm Owner's Identification card. Dkt. 67 ¶ 11. Lavin completed a report about his calls with Dr. Tschan and plaintiff. Dkt. 67 ¶ 12. Sergeant Charles Buczynski reviewed Lavin's report, noted the valid FOID card, and decided he wanted to speak with plaintiff to see if he had any weapons. Dkt. 67 ¶¶ 12-13.

Around 11:00 p.m., Buczynski and Lavin went to plaintiff's house along with fellow Arlington Heights police officers Mark Ruge and Brian McGuire. Dkt. 67 ¶ 14. Plaintiff's adult son, Michael Lovi, went to get his father after he saw the officers approach the house. Dkt. 59 ¶ 10. Plaintiff came out and met the four police officers on his front porch. Dkt. 67 ¶ 15. As on-duty police officers, the four men were all in uniform and armed. Dkt. 67 ¶ 15; Dkt. 60-7 at 83:6-11, Deposition of

Officer Mark Ruge. One of the officers asked plaintiff if he threatened to harm a doctor; plaintiff replied that he had threatened to punch the doctor in the nose. Dkt. 60-1 at 39:8-12, Deposition of Arthur Lovi. The officers asked plaintiff about his weapons and plaintiff volunteered to get them. Dkt. 59 ¶ 13. Plaintiff opened the screen door to go in the house. Dkt. 59 ¶ 14. Though plaintiff did not explicitly invite them, the officers followed him in. Dkt. 59 ¶¶ 14, 16.

According to plaintiff, once the officers entered the house, he stopped and said, "Hold on. I didn't invite you into my house. Don't you have to have a search warrant?" Dkt. 67 ¶ 16. Plaintiff also says he asked, "Why are you in my house?" *Id.* Plaintiff did not explicitly ask them to leave. Dkt. 60-1 at 47:18-19. Plaintiff testified that one of the officers replied that they did not have a search warrant, "but if [plaintiff] wanted [them] to go get one, [they'd] come back and tear the living shit out of [plaintiff's] house." Dkt. 60-1 at 47:22-24. Plaintiff says this response caused him to be afraid and intimidated. Dkt. 60-1 at 48:1-8. At that point, plaintiff told the officers he would get the guns and bring them to the officers. Dkt. 60-1 at 50:23-51:2. As plaintiff walked towards his den he could see the officers following him. Dkt. 60-1 at 50:23-51:2.

In the den, one of the officers asked where the weapons were and plaintiff answered that all three were on the mantle of the fireplace. Dkt. 59 ¶ 19; Dkt. 60-1 at 51:12-13. Plaintiff took a .38 caliber from the mantle and handed it to an officer. Dkt. 59 ¶ 20. One of the officers asked plaintiff how to remove the bullets from the .38 and plaintiff responded that it was not loaded. Dkt. 59 ¶ 21. The officer asked

plaintiff to show him that it was unloaded, so plaintiff told the officer how to open the gun. *Id*. This officer next asked plaintiff where the other weapon was, referring to plaintiff's .22 caliber firearm. Dkt. 59 ¶ 22. Plaintiff handed the .22 to one of the officers. *Id*. Finally, an officer commented about an old musket resting on nails underneath the mantle. Dkt. 59 ¶ 23. The officer took the musket off the wall. *Id*. According to plaintiff, the officers also took his FOID card to hold as "evidence." Dkt. 60-1 at 137:22-138:6.

As the officers were leaving the house, plaintiff told them he wanted a receipt for the three guns. Dkt. 59 ¶ 26. One of the officers told him he would have to follow them to the police station to get one. *Id*. Plaintiff followed the officers to the station and received a receipt for the guns and FOID card. Dkt. 59 ¶ 27. While at the station, plaintiff asked Commander Michael Kearney when he would get his guns back. Dkt. 67 ¶ 24. Plaintiff testified that Kearney told him he could have his guns once Dr. Tschan wrote a letter saying that plaintiff was "not a harm" to himself or anybody else. Dkt. 60-1 at 60:11-14. According to plaintiff, he requested his property back several times over the next two months but Kearney would not return it without a letter from Dr. Tschan. Dkt. 60-1 at 112:10-113:9.

## B. The September 1, 2012 Incident

On September 1, 2012, plaintiff called the Arlington Heights Police Department to complain about the officers' actions two days prior. Dkt. 67 ¶ 30. Plaintiff spoke with Commander Richard Gausselin. Dkt. 59 ¶ 29. Gausselin asked if he could come to plaintiff's house to speak with him and plaintiff said, "Fine.

Come on by." Dkt. 59 ¶ 20. A short while later, Gausselin and Officer Michael Swanson drove to plaintiff's home and plaintiff greeted them outside on the porch. Dkt. 59 ¶¶ 31-32. Gausselin spoke with plaintiff about his deceased wife and about how she and Gausselin used to work together at a high school. Dkt. 67 ¶ 35. This conversation upset plaintiff. *Id*. The rest of what happened is in dispute, but according to plaintiff, Gausselin said he was concerned plaintiff might have a heart attack. Dkt. 60-1 at 79:12-18. Though Plaintiff told Gausselin he had no heart problems, Gausselin insisted on calling an ambulance. Dkt. 60-1 at 79:21-80:24. When the ambulance arrived, Gausselin told him to go with the paramedics but plaintiff said he would not. Dkt. 60-1 at 81:13-18. Gausselin continued to insist, telling plaintiff to get into the ambulance or else Gausselin would handcuff plaintiff and "throw" him into the ambulance. Dkt. 60-1 at 81:24-82:3. Because plaintiff was "fearful that [Gausselin] was going to do that," he complied with Gausselin's command. Dkt. 60-1 at 82:4-22. As the paramedics led plaintiff away, he told them, "You know you're taking me against my will." Dkt. 60-1 at 82:18-22. Plaintiff was taken to Northwest Community Hospital and given a psychological examination. Dkt. 59 ¶ 45; Dkt. 67 ¶ 40. He was discharged later that day. Dkt. 59 ¶ 46.

### C. FOID Investigation

After the officers seized plaintiff's three firearms and FOID card, they contacted the Illinois State Police to see if plaintiff's FOID card would be canceled. Dkt. 59 ¶ 47. On September 24 and 27, 2012, the Illinois State Police orally informed Officer Lavin that they would not be canceling plaintiff's FOID card. Dkt.

67 ¶ 26; Dkt. 60-10. The Arlington Heights Police Department received written confirmation of this outcome on October 31, 2012. Dkt. 59 ¶ 48. Plaintiff's firearms and FOID card were returned on November 2, 2012. Dkt. 59 ¶ 49.

### D.   Procedural History

On January 31, 2013, plaintiff filed a complaint in case number 13-cv-00788 ("Lovi I"). Dkt. 1. Plaintiff brought Counts I-IV against each of defendants Buczynski, Lavin, McGuire, and Ruge, respectively alleging: (1) unreasonable seizure of his firearms and FOID card in violation of the Fourth Amendment; (2) failure to intervene in this unreasonable seizure; (3) unreasonable search of his home in violation of the Fourth Amendment; and (4) intentional infliction of emotional distress for attempting to have his FOID card revoked. Dkt. 1 ¶¶ 40-54. Counts V and VI were brought against defendant Village of Arlington Heights for *respondeat superior* liability on the state law claim and for indemnification. Dkt. ¶¶ 55-58.

On September 24, 2013, after being denied leave to amend his complaint in Lovi I, Dkt. 25, plaintiff filed a complaint in case number 13-cv-06854 ("Lovi II"). Dkt. 41-3. Count I alleges defendants Gausselin and Swanson unreasonably seized plaintiff in violation of the Fourth Amendment by forcing him into the ambulance. Dkt. 41-3 ¶¶ 27-32. Count II alleges defendant Kearney violated plaintiff's second amendment right to bear arms by refusing to return his firearms and FOID card. Dkt. 41-3 ¶¶ 33-37. Count III alleges Kearney and Gausselin conspired to deprive plaintiff of his FOID card and firearms in violation of the Second Amendment. Dkt.

41-3 ¶¶ 38-43. Count IV alleges intentional infliction of emotional distress against Gausselin, Kearney, and Swanson for forced hospitalization. Dkt. 41-3 ¶¶ 44-47. Finally, Counts V and VI were brought against defendant Village of Arlington Heights for *respondeat superior* liability on the state law claim and for indemnification. Dkt. 41-3 ¶¶ 48-51.

## III.   Analysis

### A.   Fourth Amendment Claims

#### 1.   Warrantless Entry into Plaintiff's Home

Plaintiff claims defendants Buczynski, Lavin, McGuire, and Ruge[2] violated his fourth amendment right to be free from unreasonable search and seizure by entering his home without a warrant. Dkt. 1 ¶¶ 47-50. Defendants argue plaintiff impliedly consented to them entering his home. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). But a person may "waive his or her fourth amendment rights by consenting to a search." *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976). "Consent can be express or implied." *United States v. Risner*, 593 F.3d 692, 694 (7th Cir. 2010). The test for implied consent asks two related questions: First, could plaintiff's actions be reasonably interpreted to manifest consent? *Griffin*, 530 F.2d at 743. Second, was that consent voluntary? *Id*.

In arguing that plaintiff impliedly consented to their entry, defendants primarily rely on three decisions: *United States v. Villegas*, 388 F.3d 317 (7th Cir.

---

[2] Neither plaintiff nor defendants differentiates among these four defendants for the purposes of Counts I-IV in Lovi I.

2004), *Gerald M. v. Conneely*, 858 F.2d 378 (7th Cir. 1988), and *United States v. Griffin*, 530 F.2d 739 (7th Cir. 1976). In *Villegas*, DEA agents knocked on the defendant's door and identified themselves as law enforcement officers. 388 F.3d at 325. The defendant opened the door, the agents asked if they could speak with him, the defendant agreed, and the agents entered the home. *Id*. Finding nothing in the "sequence of events that evidence[d] coercion or duress . . . or any objection" by the defendant, the Seventh Circuit held that the defendant had "sufficiently manifested consent for the officers to enter his apartment." *Id*.

In *Gerald M.*, an officer visited a home to speak with two young brothers about a theft and assault they were believed to have participated in. 858 F.2d at 380. The boys' mother met the officer at the door and agreed to call her sons up from the basement, but she also instructed the officer to "wait here." *Id*. at 384. As she went to get the boys, the officer stepped inside the door and followed her down the entrance hallway. *Id*. Other than warning the officer about a dog, the mother said nothing while the officer followed her into the house. *Id*. Likewise, nothing was said about the officer's presence when the four of them talked in the living room. *Id*. While the mother testified that she was surprised the officer entered her home, she also admitted doing nothing to indicate that she disapproved. *Id*. Despite the mother's initial command to "wait here," the Seventh Circuit was persuaded by her "subsequent silence and apparent acquiescence" that the officer's presence in the home "was not against [the mother's] apparent wishes." *Id*. at 385. The court noted that the mother did not "verbally object to the entrance," did not "act astonished,"

and did not "physically respond in any way that might relay the message she disapproved of his movement." *Id.* "She simply waited for her sons and warned [the officer] of a puppy in the kitchen." *Id.*

Finally, in *Griffin*, two officers knocked on an apartment door and a man named Russell opened it a few moments later. 530 F.2d at 741. The officers asked Russell if he knew anything about a stolen mailbag reported to have been carried into the apartment. *Id.* Russell replied no and the officers asked to enter. *Id.* Again Russell declined, this time slamming the door in their faces. *Id.* After two confederates were caught fleeing the apartment, the officers knocked on the door and told Russell they had reason to believe a burglary was taking place within. *Id.* Once more, the officers asked to be admitted. *Id.* In response, Russell stepped back into the apartment and left the door partially open. *Id.* Neither officer remembered any words being spoken. *Id.* The officers entered the apartment and followed Russell down a short hallway into the living room where they discovered the mailbag. *Id.* On appeal, the Seventh Circuit found it important that Russell first refused the officers' entry. *Id.* at 743. To the court, it showed Russell was "both aware of his right to refuse entry under the circumstances and unintimidated by the officers' color of authority." *Id.* Thus, the court concluded that Russell's stepping back, leaving the door open, and leading the officers into the apartment constituted implied consent for them to enter. *Id.*

In this case, plaintiff greeted the four uniformed and armed officers on his porch around 11:00 p.m. The officers asked about plaintiff's weapons and he

volunteered to go get them. Plaintiff neither explicitly invited the officers in nor told them to wait outside. As plaintiff entered the four officers followed him in. While in his vestibule plaintiff turned around, saw the officers, and said, "Hold on, I didn't invite you into my house" and asked them, "Why are you in my house?" Plaintiff further asked whether the officers needed a search warrant to come in. Defendants responded by saying no, they did not have a search warrant, "but if [plaintiff] wanted [them] to go get one, [they'd] come back and tear the living shit out of [plaintiff's] house." Following this exchange, plaintiff turned and walked toward the den with the officers in tow. Plaintiff did not object to the officers' presence again.

I find that up through the moment plaintiff asked whether the officers needed a search warrant, no reasonable jury could conclude that plaintiff had impliedly consented to their entry. Unlike the individuals in *Villegas*, *Gerald M.*, and *Griffin*, plaintiff clearly objected to the four officers entering his home. Not only did plaintiff show this objection by turning around and confronting the officers, he also expressed orally that the defendants had not been invited in. *See Villegas*, 388 F.3d at 325 (finding nothing in the "sequence of events that evidence[d] . . . any objection"); *Gerald M.*, 858 F.2d at 385 (noting that the mother did not "verbally object to the entrance," did not "act astonished," and did not "physically respond in any way that might relay the message she disapproved of his movement"); *Griffin*, 530 F.2d at 739 (concluding that Russell's stepping back, leaving the door open, and leading the officers into the apartment impliedly invited the officers into the apartment).

Nevertheless, the encounter between plaintiff and defendants did not end at that moment. Instead, once the officers answered plaintiff's warrant question, he turned and walked to his den without further objection. Because plaintiff knew the officers were following him, *Villegas*, *Gerald M.*, and *Griffin* all instruct that plaintiff impliedly consented to them staying. *Villegas*, 388 F.3d at 325; *Gerald M.*, 858 F.2d at 385; *Griffin*, 530 F.2d at 743. Moreover, under *Griffin*, plaintiff further demonstrated his implied consent by physically acquiescing and remaining silent after having initially objected. *See Griffin*, 530 F.2d at 743. Thus, assuming plaintiff impliedly consented to the entry the moment he turned and headed toward the den, the issue becomes whether that consent was voluntary. *Griffin*, 530 F.2d at 743.

Whether consent is voluntary "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). "Where there is coercion there cannot be consent." *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968). Plaintiff argues he was coerced because (1) four armed policemen entered his home, (2) one of the officers had his hand on his gun when plaintiff met them at the door, (3) the officers threatened to go get a warrant if plaintiff did not let them in, and (4) the officers threatened to "tear the living shit" out of his house if he did not consent. Defendants argue against coercion by noting that they did not physically force their way into plaintiff's home, they did not brandish their weapons, they did not use repeated requests to break plaintiff into consenting, they were honest about their reason for the visit, and, finally, plaintiff's

question about the search warrant indicated he understood he could refuse their entry.

I find the question of whether plaintiff's consent was voluntary to be genuinely in dispute. First, each of the factors identified by plaintiff finds support in the case law. *See United States v. Gillespie*, 650 F.2d 127, 129 (7th Cir. 1981) (defendant could not have voluntarily given consent to five "heavily armed" agents and officers at defendant's door with guns in "ready" position); *United States v. Hicks*, 650 F.3d 1058, 1060-61 (7th Cir. 2011) (threat to get search warrant could render consent involuntary when officer lacks good faith basis to believe he could obtain one)[3]; *Speese v. Beyer*, 2012 WL 4018003, *6 (M.D. Pa. Aug. 8, 2012) (officer's threat to "tear up the home" precluded summary judgment on issue of consent); *Higgins v. Gee*, 2008 WL 190493, *4 (M.D. Fla. Jan. 22, 2008) (consent not voluntary in light of repeated refusals to consent coupled with officer's threat to "f___ your sh-t up"). Second, beyond these factors, I further note that the four officers arrived at plaintiff's home after 11 p.m. and obtained consent only after all four were already standing inside plaintiff's hallway. Third, in attempting to rebut plaintiff's showing, defendants fail to provide evidence that affirmatively supports a finding of voluntariness. Instead, they dwell on the absence of factors whose presence would have simply made the encounter more coercive. What is more, the only piece of arguably affirmative evidence defendants do present—that plaintiff

---

[3] Here, the officers likely had a sufficient basis to believe in good faith that they could obtain a warrant to search plaintiff's home for evidence of the crime of disorderly conduct. *See* 720 ILCS 5/26-1(a)(1); *Ellwood v. City of Chicago*, 2014 WL 883553, *7 (N.D. Ill. Mar. 6, 2014) ("A threat can be sufficient to constitute disorderly conduct"). Thus, I do not weigh this factor against voluntariness.

asked about a search warrant—is context-dependent. Even assuming that question could evidence plaintiff's knowledge of his rights, a jury could reasonably conclude that defendants' threat to "tear the living shit" out of plaintiff's house coerced him into forfeiting those rights.

Defendants' motion for summary judgment on plaintiff's unreasonable entry claim is denied.

### 2.    Seizure of Firearms and FOID Card

Defendants likewise argue that plaintiff impliedly consented to them seizing his firearms and FOID card because plaintiff "volunteered to get the guns for [d]efendants," plaintiff did not object to defendants following him into the den, plaintiff handed two of the firearms to defendants and showed them how to open them, plaintiff did not object when defendants took a third gun off the mantle, and plaintiff asked for a receipt for the three weapons. Although a jury could reasonably find that plaintiff consented to this seizure, one could just as easily find the opposite to be true. It will be for the jury to decide, for example, what plaintiff meant when he initially said he would go get the guns. Did he mean he was getting them to hand over to the officers? Or, did he mean he was getting them simply to show the officers? Further, that I have already found a genuine issue of material fact relating to plaintiff's voluntary consent to the entry bears on the voluntariness of the consent to the seizure. Making all reasonable inferences in plaintiff's favor, his question "don't you have to have a search warrant" could mean "don't you have to have a search warrant to come into my house and take my guns?"

In sum, defendants' physical presence in the hall as well as their explicit threat to "tear the living shit" out of plaintiff's house contribute to a totality of circumstances that sufficiently calls plaintiff's voluntariness into question. Thus, the question is properly put to a jury.

Defendants' motion for summary judgment on plaintiff's unreasonable seizure of property claim is denied.

### 3.    Failure to Intervene

Defendants argue briefly that plaintiff's failure-to-intervene claim must be dismissed because no reasonable jury could find that defendants violated the Fourth Amendment. Because I hold to the contrary, defendants' motion for summary judgment on plaintiff's failure-to-intervene claim is denied.

### 4.    Seizure of Plaintiff

Plaintiff alleges defendants Gausselin and Swanson unreasonably seized him in violation of the Fourth Amendment when they forced him into an ambulance against his will. As before, defendants argue they committed no violation because plaintiff consented. Taking the facts in the light most favorable to the plaintiff, I find that the voluntariness of plaintiff's consent to go in the ambulance is genuinely in dispute.

According to his testimony, plaintiff neither requested an ambulance nor complained of any problems. Instead, he affirmatively told Gausselin he had no heart issues. When the ambulance arrived, Gausselin ordered plaintiff to go with the paramedics—plaintiff again refused. Twice rebuffed, Gausselin threatened

plaintiff with the use of force, telling him to get in the ambulance or else Gausselin would handcuff him and "throw" him in there. Plaintiff testified that he complied with the order out of fear. As the paramedics led plaintiff away, he told them, "You know you're taking me against my will."[4]

On this record, a jury could reasonably find that Gausselin coerced plaintiff into getting into the ambulance in violation of the Fourth Amendment.[5] *See Bustamante*, 412 U.S. at 233 (consent coerced by threats of force is not given voluntarily). At the same time, however, plaintiff has made no showing that Swanson coerced plaintiff or proximately caused him to be seized. *See Celotex*, 477 U.S. at 322 (summary judgment proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

Defendants' motion for summary judgment on plaintiff's unreasonable seizure of person claim is granted as to defendant Swanson and denied as to defendant Gausselin.

### 5.    Qualified Immunity

Defendants contend qualified immunity protects them against suit for each of the alleged fourth amendment violations. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their

---

[4] As defendants rightly note, when asked at his deposition if the officers "force[d] you into the ambulance," plaintiff responded "no." Dkt. 60-1 at 82:16-17. However, the context of that line of questioning—in conjunction with the favorable inferences required at this time—shows that plaintiff meant the officers did not physically force him into the ambulance—a fact not in dispute.

[5] Defendants do not contest that the events of September 1, 2012 constituted a seizure under the Fourth Amendment.

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Because I find that plaintiff's evidence establishes fourth amendment violations based on illegal entry, seizure of property, and seizure of plaintiff, all that remains is to determine whether the infringed rights were clearly established at the time in question. *Id*. at 201.

As of August 30, 2012, it was clearly established that "an individual manifests consent to search only if an objective observer would understand the actions to mean consent, and that consent must be voluntary, considering the totality of the circumstances." *Dantzler v. City of Chicago*, 2013 WL 707879, *5 (N.D. Ill. Feb. 21, 2013) (considering conduct from March 2010 and relying on *Florida v. Jimeno*, 500 U.S. 248 (1991) and *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). In other words, as of that date, it was clearly established that an officer could not conduct a warrantless consent-search when the totality of the circumstances demonstrated that consent had not been voluntarily given. *Id*.

Here, a reasonable officer would have known that consent to enter a home and to seize property may not be obtained by four armed and uniformed police officers entering a home without permission at 11 p.m. and threatening to "tear the

living shit out" of the home. Likewise, a reasonable officer would have known that consent to seize someone in an ambulance cannot be obtained by repeated requests and threats of physical harm. As result, defendants are not entitled to qualified immunity on plaintiff's fourth amendment claims.[6]

## B.  Second Amendment Claims

Plaintiff alleges Kearney violated his second amendment rights by refusing to return his firearms and FOID card. Dkt 41-3 ¶¶ 34-37. Defendants say Kearney committed no violation because plaintiff consented to the initial seizure of the property and because Kearney's refusal fell within recognized exceptions to the Second Amendment. Dkt. 51 at 13. Defendants also argue for qualified immunity. Dkt. 51 at 14.

### 1.  Firearms

The Seventh Circuit recently stated that "[w]hether and to what extent the Second Amendment protects an individual's right to possess a particular gun (and limits the power of the police to seize it absent probable cause to believe it was involved in a crime) is an issue *that is just beginning to receive judicial attention*." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 571 (7th Cir. 2014) (emphasis added). Because an issue that is "just beginning to receive judicial attention" is necessarily not clearly established, qualified immunity is appropriate on this aspect of plaintiff's claim.

---

[6] Defendants' sole argument in favor of qualified immunity on the failure-to-intervene claim is that the fourth amendment right infringed by defendants seizing plaintiff's property was not clearly established. Dkt. 51 at 12. Defendants' argument fails in light of my contrary holding.

Defendants' motion for summary judgment on plaintiff's specific-firearm second amendment claim is granted.

## 2.     FOID Card

As plaintiff notes, the right of an individual to keep firearms in her home has become clearly established. *See District of Columbia v. Heller*, 554 U.S. 570, 635 (2008); *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3050 (2010). What plaintiff fails to note, however, is that this right has its exceptions. *Id.* at 626-27. And while the right itself is clearly established, its exceptions are not. *Cf. Heller*, 554 U.S. at 635 ("there will be time enough to expound upon the historical justifications for the exceptions we have mentioned *if and when those exceptions come before us*") (emphasis added).

I have found no authority which clearly establishes that Kearney's decision to temporarily deprive plaintiff of his right to bear arms pending the criminal and mental health investigation fell outside recognized exceptions to the Second Amendment, including those allowing for restrictions on the mentally ill and others who "pose a risk to society." *See, e.g.*, *Heller*, 554 U.S. at 626-27; *United States v. Patterson*, 431 F.3d 832, 835-36 (5th Cir. 2005). Plaintiff has likewise failed to identify any such authority. Therefore, given this lack of clarity, a reasonable officer could have believed that Kearney's conduct was permissible under the Second Amendment and qualified immunity is appropriate on the remainder of plaintiff's claim.

Defendants' motion for summary judgment on plaintiff's FOID-card second amendment claim is granted.

### C. Civil Conspiracy

Plaintiff alleges Kearney and Gausselin conspired to violate his constitutional rights. Although plaintiff's complaint does not make clear which rights he believes they sought to infringe, he clarifies the theory in his response brief: "Plaintiff alleges that the Defendants participated in a conspiracy to deprive him of his FOID card and his legally owned firearms in violation of the Second Amendment." Dkt. 61 at 16, Plaintiff's Response to Defendants' Motion for Summary Judgment. The brief further explains that the claim is based on the defendants' attempt to have the Illinois State Police permanently revoke his FOID card. *Id.*

To establish a civil conspiracy claim under § 1983, a plaintiff must show that the defendants agreed to deprive the plaintiff of his constitutional rights. *See Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007). If a plaintiff fails to prove an underlying constitutional injury, any attendant conspiracy claim necessarily fails. *See Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000). Plaintiff's theory is that Kearney and Gausselin conspired to violate his second amendment rights by *permanently* depriving him of his FOID card—an injury distinct from both (1) the August 30, 2012 seizure of plaintiff's property and (2) Kearney's refusal to return plaintiff's property. While the latter two theories could reasonably support a second amendment claim, there is no evidence that plaintiff was constitutionally

injured as result of having his FOID card permanently revoked by the Illinois State Police. Thus, plaintiff's civil conspiracy claim cannot lie. *See Cefalu*, 211 F.3d at 423-24.

Defendants' motion for summary judgment on plaintiff's civil conspiracy claim is granted.

### D. State Law Claims

#### 1. Intentional Infliction of Emotional Distress

Plaintiff claims defendants committed the tort of intentional infliction of emotional distress when they tried to have him hospitalized so the Illinois State Police would revoke his FOID card. Dkt. 41-1 ¶ 52; Dkt. 41-3 ¶ 45. Under Illinois law, this claim requires a showing that (1) the conduct in question was truly extreme and outrageous, (2) the actor either intended that his conduct would inflict severe emotional distress or knew that there was at least a high probability that his conduct would cause severe emotional distress, and (3) the conduct in fact caused severe emotional distress. *McGrath v. Fahey*, 126 Ill. 2d 78, 86 (1988). Under this third element, "[s]evere emotional distress is distress so severe that no reasonable person could be expected to endure it." *Lifton v. Board of Education*, 416 F.3d 571, 579 (7th Cir. 2005) (internal quotation omitted).

Here, the undisputed facts make clear that plaintiff has not made out a claim for intentional infliction of emotional distress. The only evidence of plaintiff's emotional distress comes from his deposition testimony. Plaintiff testified he was damaged emotionally as follows: (1) "beyond words," (2) "I was never so

embarrassed or humiliated in my life," (3) "threatened," (4) "had to get a psych evaluation . . . against my will," and (5) "[j]ust mental anguish." Dkt. 60-1 at 121:20-128:22.

This proffered emotional damage is insufficient as a matter of law, however, because it does not demonstrate "*severe* emotional distress." *McGrath*, 126 Ill. 2d at 86 (emphasis in original). Under Illinois law, the "infliction of such emotional distress as fright, horror, grief, shame, humiliation and worry is not sufficient to give rise to a cause of action." *Adams v. Sussman & Hertzberg, Ltd.*, 292 Ill. App. 3d 30, 38 (1st Dist. 1997) (affirming trial court's grant of judgment notwithstanding the verdict because plaintiff's "shame, humiliation and worry" was insufficient emotional damage); *Ponticiello v. Aramark Uniform and Career Apparel Services, Inc.*, 2006 WL 2699416, *13 (N.D. Ill. Sept. 19, 2006) (evidence plaintiff felt "appalled, annoyed, aggravated, disgusted, offended, upset, embarrassed, uncomfortable, belittled and self-conscious" insufficient to survive summary judgment); *see also Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 276 (2003) (holding that plaintiff sufficiently stated claim by alleging she sustained "loss of self-esteem and difficulty in forming other relationships," "Post Traumatic Stress Disorder," "depression and a fear of being with other men," that "her enjoyment of life ha[d] been substantially curtailed," and that she ha[d] incurred and [would] continue to incur "medical and psychological expenses in an effort to become cured or relieved from the effects of her mental distress.")

In support of his claim, plaintiff points to the fact that he visited a counselor at Veterans Affairs "and discussed how stressful the situation with the Arlington Heights Police Department was on him." Dkt. 61 at 19. To the extent the record lacks information about these visits, plaintiff chides defendants for failing to depose the doctor. *Id.* At this stage of the litigation, though, it is plaintiff's burden to present evidence of his claim and the only evidence he presents is as follows (Dkt. 60-1 at 135:13-136:19):

> Q.      . . . Since this incident, have you talked with any other doctors about how it made you feel?
>
> A.      Yes.
>
> Q.      And what doctor is that?
>
> A.      The psychiatrist down at the Veterans Administration [Dr. Cataldo].
>
> [. . .]
>
> Q.      And you had conversation [sic] with Dr. Cataldo regarding how the incident with the Arlington Heights Police Department affected you?
>
> A.      Correct.

This brief exchange, even when coupled with plaintiff's testimony concerning his emotional damage, is insufficient to show the "severe emotional distress" required under Illinois law. As result, plaintiff's claim fails.[7] *Cf. Porter v. City of Chicago*, 700 F.3d 944, 956 (7th Cir. 2012) (affirming grant of summary judgment for defendant because plaintiff "failed to put forth evidence from which a reasonable jury could

---

[7] It is unclear whether plaintiff's two intentional infliction of emotional distress claims contemplate the same theory. *Compare* Dkt. 41-1 ¶¶ 51-54 *with* Dkt. 41-3 ¶¶ 44-46. In any event, the record evidence is insufficient to support any such claim, so both fail.

conclude that her work environment was objectively offensive and that the conduct complained of was severe or pervasive"); *see also Goodman v. National Security Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) ("We often call summary judgment the 'put up or shut up' moment in litigation, by which we mean that the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, we mean evidence on which a reasonable jury could rely.") (internal citations omitted). And because plaintiff's state tort claim is dismissed, his *respondeat superior* claims fail as well.

Defendants' motions for summary judgment on plaintiff's intentional infliction of emotional distress and *respondeat superior* claims are granted.

### 2. Indemnification (745 ILCS 10/9-102)

The Village defendant argues that plaintiff's claim for indemnification under 745 ILCS 10/9-102 is not timely because judgment has not yet been entered against the officers. Dkt. 51 at 19. Defendant relies on the decision *Ovied v. Heavener*, which indeed held that "a section 9-102 claim cannot be brought prior to judgment because there would be no basis for the cause of action." 1997 WL 445933, *3 (N.D. Ill. July 31, 1997). That case, however, does not consider the Seventh Circuit's decision in *Wilson v. City of Chicago*, 120 F.3d 681 (7th Cir. 1997), which came down just ten days before *Ovied*. In *Wilson*, the court held that although the city could not "be made to pay a judgment while the liability of its employee [was] still in question . . . [i]t [did] not follow that [plaintiff] could not proceed under section 9-102 until the judgment against [the employee] became final." 120 F.3d at 684-85.

24

Defendant tries to distinguish *Wilson* by arguing that it turned on the city stating that it would not pay any judgment entered against the employee. Dkt. 66 at 15. In this case, the Village notes, Arlington Heights has made no such representation. Dkt. 66 at 15. Nevertheless, I find persuasive the decisions that have rejected defendant's proposed requirement. *See, e.g.*, *Perkins v. O'Shaughnessy*, 2011 WL 579333, *4 (N.D. Ill. Feb. 9, 2011); *Blancas v. Village of Rosemont*, 2008 WL 4682217, *2 (N.D. Ill. May 21, 2008); *Stenson v. Town of Cicero*, 2005 WL 643334, *19 (N.D. Ill. Mar. 15, 2005). As the court said in *Wilson*, "we would be more sympathetic to the [Village's] argument if we could see any benefit from forcing [plaintiff] to wait until a final judgment was entered and made incontestable by exhaustion of his appellate remedies." 120 F.3d at 685.

Defendant's motion for summary judgment on plaintiff's indemnification claim is denied.

## IV. Conclusion

In case number 13-cv-00788, defendants' motion for summary judgment is granted on Counts IV and V, and denied on Counts I, II, III, and VI.

In case number 13-cv-06854, defendants' motion for summary judgment is granted on Counts II, III, IV, and V, and denied on Count VI. On Count I, the motion is granted as to defendant Swanson and denied as to defendant Gausselin.

ENTERED:

Manish S. Shah
United States District Judge

Date: 8/1/14